**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**
_____

**TOM G. PALMER, GEORGE LYON,**
**EDWARD RAYMOND, AMY MCVEY,**
**and SECOND AMENDMENT FOUNDATION,**
**INC.,**

                                   **Plaintiffs,**

                         **v.**                                                    **1:09-CV-1482**
                                                                                 **(FJS)**

**DISTRICT OF COLUMBIA and**
**CATHY LANIER,**

                                    **Defendants.**
_____

**APPEARANCES**                                          **OF COUNSEL**

**GURA & POSSESSKY, PLLC**               **ALAN GURA, ESQ.**
101 North Columbus Street, Suite 405
Alexandria, Virginia 22314
Attorneys for Plaintiffs

**OFFICE OF THE ATTORNEY**           **ANDREW J. SAINDON, ESQ.**
**GENERAL FOR THE DISTRICT**
**OF COLUMBIA**
441 Fourth Street, N.W.
6th Floor South
Washington, D.C. 20001
Attorneys for Defendants

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

    Currently before the Court are Plaintiffs' motion for summary judgment and Defendants' cross-motion for summary judgment.

## II. BACKGROUND

In their complaint, Plaintiffs assert two claims for relief. In their first claim, Plaintiffs allege that, "[b]y requiring a permit to carry a handgun in public, yet refusing to issue such permits and refusing to allow the possession of any handgun that would be carried in public, Defendants maintain a complete ban on the carrying of handguns in public by almost all individuals." *See* Dkt. No. 1, Complaint at ¶ 39. Plaintiffs also contend that "Defendants' laws, customs, practices and policies generally banning the carrying of handguns in public violate the Second Amendment to the United States Constitution, facially and as applied against the individual plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983." *See id.* at ¶ 40.

In their second claim for relief, Plaintiffs allege that "Defendants' laws, customs, practices and policies generally refusing the registration of firearms by individuals who live outside the District of Columbia violate the rights to travel and equal protection secured by the Due Process Clause of the Fifth Amendment to the United States Constitution, facially and as applied against the individual plaintiffs in this action, damaging plaintiffs in violation of 42 U.S.C. § 1983." *See id.* at ¶ 42.

Plaintiffs seek relief in the form of an Order permanently enjoining Defendants, "their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing D.C. Code § 7-2502.02(a)(4) to ban registration of handguns to be carried for self-defense by law-abiding citizens[.]" *See id.* at WHEREFORE Clause. Furthermore, Plaintiffs seek an Order permanently enjoining Defendants, "their officers, agents, servants, employees, and all persons in active concert or

participation with them who receive actual notice of the injunction, from enforcing D.C. Code § 22-4504(a), OR, in the alternative, ordering [D]efendants to issue licenses to carry handguns to all individuals who desire such licenses and who have satisfied the existing requirements, aside from residence requirements, for the registration of a handgun[.]" *See id.* Finally, Plaintiffs seek an Order permanently enjoining Defendants, "their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from denying firearm registration and handgun carry permit applications made by otherwise qualified individuals on account of lack of residence within the District of Columbia[.]" *See id.*[1]

The parties do not dispute the basic facts that underlie this action. D.C. Code § 7-2502.01(a) provides that "no persons or organization in the District shall possess or control any firearm, unless the persons or organization holds a valid registration certificate for the firearm." D.C. Code § 7-2502.02(a)(4) provides that individuals who are not retired police officers may only register a handgun "for use in self-defense within that person's home." Pursuant to this statutory limitation, Defendants distribute handgun registration application forms requiring applicants to "give a brief statement of your intended use of the firearm and where the firearm will be kept."

Defendants maintain a custom, practice and policy of refusing to entertain gun registration applications by individuals who do not reside in the District of Columbia. Defendants require gun registration applicants to submit "[p]roof of residency in the District of Columbia (e.g., a valid DC operator's permit, DC vehicle registration card, lease agreement for a

---

[1] Plaintiffs also seek costs of the suit, including attorney fees and costs under 42 U.S.C. § 1988 and declaratory relief consistent with the injunction. *See* Complaint at WHEREFORE Clause

residence in the District, the deed to your home or other legal document showing DC residency." A first violation of the District of Columbia's ban on the ownership or possession of unregistered handguns is punishable as a misdemeanor by a fine of up to $1,000, imprisonment of up to five years, or both. *See* D. C. Code § 7-2507.06.

D.C. Code § 22-4504(a) provides that "[n]o person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed." The first violation of this section by a non-felon is punishable by a fine up to $5,000 and imprisonment of up to five years.

Former D.C. Code § 22-4506 empowered the District of Columbia's police chief to issue licenses to carry handguns to individuals, including to individuals not residing in the District of Columbia. However, it was Defendant District of Columbia's policy for many years not to issue such licenses. On December 16, 2008, the District of Columbia's City Council and Mayor repealed the Police Chief's authority to issue handgun carry licenses. Accordingly, the District of Columbia lacks any mechanism to issue handgun carry licenses to individuals.

Plaintiff Palmer, a resident of the District, would carry a functional handgun in public for self-defense but refrains from doing so because he fears arrest, prosecution, fine, and imprisonment as he does not possess a license to carry a handgun. Plaintiff Palmer sought to register a handgun in the District of Columbia so that he might carry it for self-defense. On or about May 12, 2009, Defendant Lanier denied Plaintiff Palmer's application to register a handgun for the following reason:

> The intended use of the firearm as stated on your firearms

> registration application, "I intend to carry this firearm, loaded, in public, for self-defense, when not kept in my home" is unacceptable per the "Firearms Registration Emergency Amendment Act of 2008," which states that pistols may only be registered by D.C. residents for protection within the home.

Defendant Lanier subsequently approved Plaintiff Palmer's application to register the handgun for home self-defense.

Plaintiff George Lyon, a resident of the District, would carry a functional handgun in public for self-defense but refrains from doing so because he fears arrest, prosecution, fine, and imprisonment as he does not possess a license to carry a handgun in Washington, D.C. Plaintiff Lyon is licensed to carry handguns in the states of Virginia, Utah, and Florida. He has approximately 240 hours of firearms training, of which approximately 140 hours relate specifically to handguns. Plaintiff Lyon sought to register a handgun in the District of Columbia so that he might carry it for self-defense. On or about April 8, 2009, Defendant Lanier denied Plaintiff Lyon's application to register a handgun for the following reason:

> The intended storage and use of the firearm as stated on your firearms registration application, "carrying personal protection, keep at home or office" is unacceptable per the "Firearms Registration Emergency Amendment Act of 2008," which states that pistols may only be registered by D.C. residents for protection within the home.

Defendant Lanier subsequently approved Plaintiff Lyon's application to register the handgun for home self-defense.

At the time Plaintiffs filed this action, Plaintiff Raymond was not a resident of the District, was enrolled as a student in the Franklin Pierce Law Center in New Hampshire, was employed as a Patent Examiner and owned a home in Waldorf, Maryland. Plaintiff Raymond

holds a Master of Business Administration degree as well as a Master of Science degree in Electrical Engineering. He has started various successful businesses and is an honorably discharged Navy veteran.

On April 6, 2007, District of Columbia Police stopped Plaintiff Raymond for allegedly speeding. At that time, Plaintiff Raymond held valid permits to carry a handgun issued by the states of Maryland and Florida and still holds those permits. Although Plaintiff Raymond was never charged with a traffic violation, he was charged with carrying a pistol without a license because his loaded handgun was located in his car's center console. Plaintiff Raymond subsequently pled guilty to misdemeanor possession of an unregistered firearm and unregistered ammunition. He successfully completed a sentence of probation.

Plaintiff Raymond would carry a functional handgun in public for self-defense while visiting and traveling through the District of Columbia but refrains from doing so because he fears another arrest and prosecution as well as fine and imprisonment as he does not possess a license to carry a handgun in the District of Columbia. On June 26, 2009, Plaintiff Raymond sought to register a handgun in the District of Columbia, but he was refused an application form because of his lack of residence in the District.

Plaintiff Amy McVey, a resident of the District, would carry a functional handgun in public for self-defense but refrains from doing so because she fears arrest, prosecution, fine, and imprisonment as she does not possess a license to carry a handgun in the District of Columbia. Plaintiff McVey is licensed by the state of Virginia to publicly carry a handgun.

Plaintiff McVey sought to register a handgun in the District of Columbia so that she could carry it for self-defense. On July 7, 2009, Defendant Lanier denied her application to register a

handgun for the following reason:

> The intended storage and use of the firearm as stated on your firearms registration application, "I intend to carry the loaded firearm in public for self-defense when not stored in my home" is unacceptable per the "Firearms Registration Emergency Amendment Act of 2008," which states that pistols may only be registered by D.C. residents for protection within the home.

Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of Washington with its principal place of business in Bellevue, Washington. SAF has more than 650,000 members and supporters nationwide, including in the District of Columbia. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms and the consequences of gun control. SAF expends its resources encouraging the exercise of the right to bear arms and advising and educating its members, supporters, and the general public about the law with respect to carrying handguns in the District of Columbia. The issues raised by, and consequences of, Defendants' policies are of great interest to SAF's constituency. Defendants' policies regularly cause SAF to expend resources as people turn to it for advice and information. Defendants' policies bar the members and supporters of SAF from obtaining permits to carry handguns.

### III. DISCUSSION

The Supreme Court's decisions in *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010), direct the Court's analysis of Plaintiffs' claims. In *Heller*, the plaintiffs mounted a Second Amendment challenge to a District of

Columbia law that "totally ban[ned] handgun possession in the home" and "require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock[.]" *Heller*, 554 U.S. at 603, 628.  The validity of the challenged measures depended, as a preliminary matter, on whether the Second Amendment codified an individual right or a collective right.  *See id.* at 577.  After consulting the text's original public meaning, the Court concluded that the Second Amendment codified a pre-existing, individual right to keep and bear arms and that the "central component of the right" was self-defense.  *See id.* at 592, 599.  Furthermore, the Court held that, because "the need for defense of self, family, and property is most acute in the home," the D.C. ban on the home use of handguns – "the most preferred firearm in the nation" – failed "constitutional muster" under any standard of heightened scrutiny.  *Id.* at 628-29 & n.27.  The same was true for the trigger-lock requirement.  *See id.* at 635.  The *Heller* Court concluded that it did not need to "undertake an exhaustive historical analysis . . . of the full scope of the Second Amendment" to dispose of the case.  *Id.* at 626.  Nor did the Court have a reason to specify, for future cases, which burdens on the Second Amendment right triggered which standards of review, or whether a tiered-scrutiny approach was even appropriate in the first place.  *See id.* at 628-29.  By any measure, the Court found that the District of Columbia statute overreached.

Two years later, in *McDonald*, the Court evaluated a similar handgun ban that the City of Chicago had enacted.  The question presented in *McDonald*, however, was not whether the ban infringed the Chicago's residents' Second Amendment rights, but, rather, whether a state government could even be subject to the strictures of the Second Amendment.  The answer to that question depended on whether the right was "'deeply rooted in this Nation's history and tradition'" and "fundamental to *our* scheme of ordered liberty[.]"  *McDonald*, 130 S. Ct. at 3036.

The Court stated that its "decision in *Heller* point[ed] unmistakably to the answer." *Id.* The Court explained that self-defense, recognized since ancient times as a "basic right," was the "central component" of the Second Amendment guarantee. *Id.* Thus, the Court concluded that that right restricted not only the federal government but, under the Fourteenth Amendment, also the states. *See id.* at 3026. Having reached that conclusion, the Court remanded the case to the Seventh Circuit for an analysis of whether, in light of *Heller*, the Chicago handgun ban infringed the Second Amendment right. *See id.* at 3050.

Neither *Heller* nor *McDonald* speaks explicitly or precisely to the scope of the Second Amendment right outside the home or to what it takes to "infringe" that right. However, both opinions, at the very least, "point[] in a general direction." *Ezell v. City of Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (noting that *Heller* does not leave the court "without a framework for how to proceed"). As the Ninth Circuit recently noted in *Peruta v. Cnty. of San Diego*, 742 F.3d 1144 (9th Cir. 2014),[2] which addressed statutes very similar to the ones at issue in this case,

> [t]o resolve the challenge to the D.C. restrictions, the *Heller* majority described and applied a certain methodology: it addressed, first, whether having operable handguns in the home amounted to "keep[ing] and bear[ing] Arms" within the meaning of the Second Amendment and, next, whether the challenged laws, if they indeed

---

[2] The *Peruta* court addressed the issue of "whether a responsible, law-abiding citizen has a right under the Second Amendment to carry a firearm in public for self-defense." *Peruta*, 742 F.3d at 1147. As a preliminary matter, the court noted that "California generally prohibits the open or concealed carriage of a handgun, whether loaded or unloaded, in public locations." *Id.* (citations and footnote omitted). However, an individual could apply for a license to carry a concealed weapon in the city or county in which he worked or resided. *See id.* at 1148 (citations omitted). To obtain such a license, however, an applicant had to meet several requirements, including a demonstration of good moral character, completion of a specified training course, and establishing good cause. *See id.* (citations omitted). The plaintiff challenged San Diego County's procedures for obtaining a concealed-carry license, in particular its definition of the term "good cause." *See id.*

did burden constitutionally protected conduct, "infringed" the right.
*Id.* at 1150.³

In analyzing the issues in this case, the Court must apply the two-step approach that the District of Columbia Circuit set forth in *Heller v. Dist. of Columbia (Heller II)*, 670 F.3d 1244 (D.C. Cir. 2011).  The first question requires this Court to decide whether the restricted activity, in this case, a restriction on a responsible, law-abiding citizen's ability to carry a gun outside the home for self-defense falls within the Second Amendment right to keep and bear arms for the purpose of self defense.  *See Peruta*, 742 F.3d at 1150 (citing *Ezell*, 651 F.3d at 701; *Kachalsky v. City of Westchester*, 701 F.3d 81, 90 (2d Cir. 2012)).  To determine the precise methods by which that right's scope is discerned, the Supreme Court has directed, in both *Heller* and *McDonald*, that courts must consult "both text and history."  *Heller*, 554 U.S. at 595, *McDonald*, 130 S. Ct. at 3047).

As the Court noted in *Heller*, "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad."  *Heller*, 554 U.S. at 634-35.  To arrive at the original understanding of the right, "we are guided by the principle that '[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning'" unless evidence suggests that the language

---

³ As the *Peruta* court noted, several other circuit courts have also applied this two-step inquiry.  *See Peruta*, 742 F.3d at 1150 (citing *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 194 (5th Cir. 2012); *United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012); *Ezell*, 651 F.3d at 701-04; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800-01 (10th Cir. 2010); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010)).

was used idiomatically. *Id.* at 576 (quoting *United States v. Sprague*, 282 U.S. 716, 731, 51 S. Ct. 220, 75 L. Ed. 640 (1931)) (other citation omitted). "Of course, the necessity of this historical analysis presupposes what *Heller* makes explicit: the Second Amendment right is 'not unlimited.'" *Peruta*, 742 F.3d at 1151 (quoting [*Heller*, 554 U.S.] at 595, 128 S. Ct. 2783). Furthermore, "[i]t is 'not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.'" *Id.* (quoting [*Heller*, 554 U.S.] at 626, 128 S. Ct. 2783). "Rather, it is a right subject to 'traditional restrictions,' which themselves   and this is a critical point   tend 'to show the scope of the right.'" *Id.* (quoting *McDonald*, 130 S. Ct. at 3056 (Scalia, J., concurring)) (citing *Kachalsky*, 701 F.3d at 96; *Nat'l Rifle Ass'n of Am.*, 700 F.3d at 196 ("For now, we state that a longstanding presumptively lawful regulatory measure . . . would likely [burden conduct] outside the ambit of the Second Amendment."); *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) ("That some categorical limits are proper is part of the original meaning.")).

As the court noted in *Peruta*, "[t]he Second Amendment secures the right not only to 'keep' arms but also to '*bear*' them[,]" *Peruta*, 742 F.3d at 1151; and, as the Supreme Court explained in *Heller*, "[a]t the time of the founding, as now, to 'bear' meant to 'carry[,]'" *Heller*, 554 U.S. at 584. "Yet, not 'carry' in the ordinary sense of 'convey[ing] or transport[ing]' an object, as one might carry groceries to the check-out counter or garments to the laundromat, but 'carry for a particular purpose   confrontation.'" *Peruta*, 742 F.3d at 1151-52 (quoting [*Heller*, 554 U.S. at 584]). According to the *Heller* majority, the "natural meaning of 'bear arms'" was the one that Justice Ginsburg provided in her dissent in *Muscarello v. United States*, 524 U.S. 125 (1998), that is "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the

purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person.'" *Heller*, 554 U.S. at 584 (quoting *Muscarello*, 524 U.S. at 143, 118 S. Ct. 1911) (Ginsburg, J., dissenting) (quoting *Black's Law Dictionary* 214 (6th ed. 1998)).

Furthermore, "'bearing a weapon inside the home' does not exhaust this definition of 'carry.' For one thing, the very risk occasioning such carriage, 'confrontation,' is 'not limited to the home.'" *Peruta*, 742 F.3d at 1152 (quoting *Moore v. Madigan*, 702 F.3d 933, 936 (7th Cir. 2012)). Moreover, it is beyond dispute that "the prospect of conflict — at least, the sort of conflict for which one would wish to be 'armed and ready' — is just as menacing (and likely more so) beyond the front porch as it is in the living room." *Id.* Thus, "'[t]o speak of "bearing" arms within one's home would at all times have been an awkward usage.'" *Id.* (quotation omitted). In addition, the *Heller* Court stated that the Second Amendment secures "the right to 'protect[] [oneself] against both *public* and private violence,' . . . thus extending the right in some form to wherever a person could become exposed to public or private violence." *United States v. Masciandaro*, 638 F.3d 458, 467 (4th Cir. 2011) (Niemeyer, J., specially concurring) (quoting [*Heller*, 128 S. Ct.] at 2798, 2799). Moreover, the *Heller* Court emphasized that the need for the right was "most acute" in the home, *Peruta*, 742 F.3d at 1153 (citing *Heller*, 554 U.S. at 628, 128 S. Ct. 2783), "thus implying that the right exists outside the home, though the need is not always as '"acute."'" *Id.* (citing *McDonald*, 130 S. Ct. at 3044 (2010) ("[T]he Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.")). However, *Heller* also pointed out that "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" is presumptively lawful. *Heller*, 554 U.S. at 626. Finally, "both *Heller* and *McDonald* identif[ied] the 'core component' of

the right as self-defense, which necessarily 'take[s] place wherever [a] person happens to be,' whether in a back alley or on the back deck." *Peruta*, 742 F.3d at 1153 (citing *Moore*, 702 F.3d at 937 ("To confine the right to be armed to the home is to divorce the Second Amendment from the right of self-defense described in *Heller* and *McDonald*.")) (other citation omitted).

This Court agrees with the Ninth Circuit's statement in *Peruta* that "[t]hese passages alone, though short of dispositive, strongly suggest that the Second Amendment secures a right to carry a firearm in some fashion outside the home." *Peruta*, 742 F.3d at 1153. "Reading those lines in light of the plain meaning definition of 'bear Arms' elucidated above makes matters even clearer; the Second Amendment right 'could not rationally have been limited to the home.'" *Id.* (quoting *Moore*, 702 F.3d at 936). Although "people may 'keep Arms' (or, per *Heller*'s definition, 'have weapons,' 554 U.S. at 582, 128 S. Ct. 2783), in the home for defense of self, family, and property, they are more sensibly said to 'bear Arms' (or, *Heller*'s gloss: 'carry [weapons] . . . upon the person or in the clothing or in a pocket,' *id.* at 584, 128 S. Ct. 2783) in *nondomestic* settings." *Id.* (citing *Kachalsky*, 701 F.3d at 89 n.10 ("The plain text of the Second Amendment does not limit the right to bear arms to the home."); *Drake v. Filko*, 724 F.3d 426, 444 (3d Cir. 2013) (Hardiman, J., dissenting) ("To speak of 'bearing' arms solely within one's home not only would conflate 'bearing' with 'keeping,' in derogation of the Court's holding that the verbs codified distinct rights, but also would be awkward usage given the meaning assigned the terms by the Supreme Court.")) (footnote omitted).

In addition to the textual analysis of the phrase "bear Arms," the Court in *Heller* looked to the original public understanding of the Second Amendment right as evidence of its scope and meaning, relying on the "important founding-era legal scholars." *Heller*, 554 U.S. at 600-03

(examining the public understanding of the Second Amendment in the period after its ratification because "[t]hat sort of inquiry is a critical tool of constitutional interpretation").  Based on its historical review, the Court found support for the proposition that the Second Amendment secures an individual right to carry in case of confrontation means nothing if not the general right to carry a common weapon outside the home for self-defense.  Furthermore, as the court in *Peruta* correctly pointed out, "with *Heller* on the books, the Second Amendment's original meaning is now settled in at least two relevant respects."  *Peruta*, 742 F.3d at 1155.  "First, *Heller* clarifies that the keeping and bearing of arms is, *and has always been*, an individual right.  *Id.* (citing [*Heller*], 554 U.S. at 616, 128 S. Ct. 2783).  "Second, the right is, *and has always been*, oriented to the end of self-defense."  *Id.* (citation omitted).  After an exhaustive summary of the text and history of the Second Amendment, the Ninth Circuit in *Peruta* concluded that "the carrying of an operable handgun outside the home for the lawful purpose of self-defense, though subject to traditional restrictions, constitutes 'bear[ing] Arms' within the meaning of the Second Amendment."  *Peruta*, 742 F.3d at 1166.  As the Ninth Circuit noted, this conclusion is not surprising in light of the fact that other circuits have reached the same result.  *See id.* (citing *Moore*, 702 F.3d at 936 ("A right to bear arms thus implies a right to carry a loaded gun outside the home."); *Drake*, 724 F.3d at 431 (recognizing that the Second Amendment right "*may* have some application beyond the home"); *Woollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013) ("We . . . assume that the *Heller* right exists outside the home. . . ."); *Kachalsky*, 701 F.3d at 89 (assuming that the Second Amendment "must have *some* application in the very different context of the public possession of firearms")).  This Court, joining with most of the other courts that have addressed this issue, reaches this same conclusion.

Finally, as the *Peruta* court pointed out, "[u]nderstanding the scope of the right is not just necessary, it is key to [the court's] analysis [because,] if self-defense outside the home is part of the core right to 'bear arms' and the [District of Columbia's] regulatory scheme prohibits the exercise of that right, no amount of interest-balancing under a heightened form of means-end scrutiny can justify [the District of Columbia's] policy." *Id.* at 1167 (citing *Heller*, 554 U.S. at 634, 128 S. Ct. 2783 ("The very enumeration of the right takes out of the hands of government — even the Third Branch of Government — the power to decide on a case-by-case basis whether the right is *really worth* insisting upon.")). Thus, having concluded that carrying a handgun outside the home for self-defense comes within the meaning of "bear[ing] Arms" under the Second Amendment, the Court must now ask whether the District of Columbia's total ban on the carrying of handguns within the District "infringes" that right.

This question is not difficult to answer. As the Seventh Circuit stated in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), "[a] blanket prohibition on carrying gun[s] in public prevents a person from defending himself anywhere except inside his home; and so substantial a curtailment of the right of armed self-defense requires a greater showing of justification than merely that the public *might* benefit on balance from such a curtailment, though there is no proof that it would." *Id.* at 940. This does not mean that the government cannot place some reasonable restrictions on carrying of handguns; for example, "when a state bans guns merely in particular places, such as public schools, a person can preserve an undiminished right of self-defense by not entering those places; since that's a lesser burden, the state doesn't need to prove so strong a need." *Id.* The District of Columbia appears to be the only jurisdiction that still has such a complete ban on the carrying of ready-to-use handguns outside the home. That does not mean

that other jurisdictions are indifferent to the dangers that the widespread public carrying of guns; rather, those jurisdictions "have decided that a proper balance between the interest in self-defense and the dangers created by carrying guns in public is to limit the right to carry a gun to responsible persons rather than to ban public carriage altogether[.]" *Id.* at 940.  In addition, to "the usual prohibitions of gun ownership by children, felons, illegal aliens, lunatics, and in sensitive places such as public schools, the propriety of which was not questioned in *Heller* . . . some states sensibly require that an applicant for a handgun permit establish his competence in handling firearms." *Id.* at 940-41 (internal parenthetical omitted).  Some states "also permit private businesses and other private institutions (such as churches) to ban guns from their premises." *Id.* at 941.

In light of *Heller, McDonald*, and their progeny, there is no longer any basis on which this Court can conclude that the District of Columbia's total ban on the public carrying of ready-to-use handguns outside the home is constitutional under any level of scrutiny.  Therefore, the Court finds that the District of Columbia's complete ban on the carrying of handguns in public is unconstitutional.  Accordingly, the Court grants Plaintiffs' motion for summary judgment and enjoins Defendants from enforcing the home limitations of D.C. Code § 7-2502.02(a)(4) and enforcing D.C. Code § 22-4504(a) unless and until such time as the District of Columbia adopts a licensing mechanism consistent with constitutional standards enabling people to exercise their Second Amendment right to bear arms.[4]  Furthermore, this injunction prohibits the District from

---

[4] The Court notes that, in *Heller v. Dist. of Columbia*, 08-CV-1289, Dkt. No. 83, Judge Boasberg recently dismissed all of the plaintiffs' challenges to the constitutionality of the District's firearm laws with prejudice except for their challenge to the vision requirement for gun registration, which, because he decided that challenge based on jurisdictional grounds, he
(continued...)

completely banning the carrying of handguns in public for self-defense by otherwise qualified non-residents based **solely** on the fact that they are not residents of the District.

### C. Equal protection and right to travel challenges to residency requirements

Plaintiff Raymond, the only non-resident individual Plaintiff, and SAF, insofar as some of its members who are not residents of the District of Columbia who would like to carry a hand gun in the District when they are there, argue that Defendants' practice of refusing to issue a

---

[4](...continued)
dismissed without prejudice. *See id.* at 62. The plaintiffs had challenged the registration requirements of the District's gun laws. The issue of the complete ban on the carrying of handguns in the District for self-defense was not at issue nor was the residency requirement at issue in that case. What were at issue, however, were the regulations pertaining to the registration of firearms, specifically the basic registration requirements as they applied to long guns and the following registration requirements that applied to all guns: (1) to register a weapon, registrants must appear in person and in possession of the firearm to be registered and must submit to being photographed and fingerprinted, *see* D.C. Code § 7-2502.04; (2) to register a weapon, registrants must complete a firearms-training and safety class and pass a test demonstrating knowledge of the District's firearms laws, *see* D. C. Code § 7-2502.03(a)(10), (13); (3) registrants are limited to registering one pistol every thirty days, *see* D.C. Code § 7-2502.03(e); (4) firearm-registration certificates automatically expire three years after the date they are issued, unless the registrant renews them, *see* D. C. Code § 7-2502.07a(a), and registrants are eligible to renew their certificates so long as they continue to meet the District's initial registration requirements, *see* D.C. Code § 7-2502.03(a), and follow any procedures the Metropolitan Police Department ("MPD") Chief establishes by rule, *see* D.C. Code § 7-2502.07a(b). In addition, the plaintiffs challenged several provisions related to the administration and enforcement of the gun-registry scheme, including (1) the requirement that gun owners keep their registration certificates with them when they are in possession of their registered firearms and be able to exhibit the certificate upon the demand of law enforcement, *see* D. C. Code § 7-2502.08(c); (2) the requirement that gun owners notify MPD in writing if their registered weapons are lost, stolen, or destroyed, if they sell or transfer their weapons, or if they change their name or address, *see* D. C. Code § 7-2502,08(a); (3) the fees associated with the registration process, *see* D.C. Code § 7-2502.05(b); and (4) the penalties for violations of the registration scheme, *see* D.C. Code § 7-2507.06. The plaintiffs in *Heller* have filed a Notice of Appeal from Judge Boasburg's May 15, 2014 Memorandum-Opinion. *See Heller*, 08-CV-1289, at Dkt. No. 84.

-17-

permit to carry a gun in the District based solely on the fact that a person is not a resident violates their right to travel and the equal protection clause of the Fourteenth Amendment.

The Court has difficulty seeing how these challenges, under the circumstances of this case, are not co-extensive with Plaintiff Raymond's Second Amendment challenges to the current District laws regarding the complete ban on carrying handguns in public. Furthermore, as things now stand, Plaintiff Raymond, and all others who are not residents of the District, are treated exactly the same as residents of the District insofar as the District has a complete ban on the carrying of handguns in public for self-defense. Thus, to the extent that Plaintiff Raymond's right to travel and equal protection claims are not co-extensive with his Second Amendment claims, the Court finds that these claims are not ripe.[5]

## IV. CONCLUSION

Having reviewed the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby **GRANTS** Plaintiffs' motion for summary judgment and **DENIES** Defendants' cross-motion for summary judgment; and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees and all persons in active concert or participation with them who receive actual notice of this Memorandum-Decision and Order, are permanently enjoined from enforcing D.C. Code § 7-2502.02(a)(4) to ban registration of handguns to be carried in public for self-defense by law-abiding citizens; and

---

[5] As stated above, with respect to Plaintiff Raymond's Second Amendment claim, the District of Columbia may not completely bar him, or any other qualified individual, from carrying a handgun in public for self-defense simply because they are not residents of the District.

the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of this Memorandum-Decision and Order are permanently enjoined from enforcing D.C. Code § 22-4504(a); and the Court further

**ORDERS** that Defendants, their officers, agents, servants, employees, and all persons in active concert or participation from them who receive actual notice of this Memorandum-Decision and Order from enforcing D.C. Code § 7-2502.02(a)(4) and D.C. Code § 22-4504(a) against individuals based solely on the fact that they are not residents of the District of Columbia.

**IT IS SO ORDERED.**

Dated: July 24, 2014
       Syracuse, New York

_____
Frederick J. Scullin, Jr.
Senior United States District Court Judge